George B. Koors, Jr. v. Commissioner. John W. Brandle and Mary Brandle v. Commissioner.
Koors v. Commissioner
Docket Nos. 1940-70, 1941-70.
United States Tax Court
T.C. Memo 1971-309; 1971 Tax Ct. Memo LEXIS 24; 30 T.C.M. (CCH) 1324; T.C.M. (RIA) 71309; December 7, 1971, Filed Allen A. Yoder, 700 Boatmen's Bank Bldg., 314 No. Broadway, St. Louis, Mo.Tom G. Parrott and Charles B. Tetrick, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: The respondent determined deficiencies in income tax against the petitioner, George B. Koors, Jr., for the taxable years 1965, 1966 and 1967 in the respective amounts of $884.90, $1,246.54 and $881.45, and against the petitioners, John W. Brandle and Mary Brandle, for the taxable years 1965 and 1966, in the respective amounts of $615.81 and $941.84. The issue presented for determination is whether a portion of the total consideration received by the petitioners under the contract of purchase agreement executed August 30, 1961, whereby petitioners sold the stock of Stanford Laboratories, Inc., to Mills Pharmaceuticals, Inc., is *25 allocable to a covenant not to compete, or, in the alternative, an alleged premium paid for an intangible asset, and is recognized to petitioners as ordinary income under section 61, Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts have been stipulated and the stipulated facts and the exhibits attached thereto are incorporated herein by this reference. Additionally, at trial this Court granted respondent's motion to incorporate the records and exhibits of Mills Pharmaceuticals, Inc., docket No. 6035-69, the trial of which immediately preceded that of the instant case. Petitioner George B. Koors, Jr., is an individual who filed joint Federal income tax returns with his deceased wife, Catherine L. Koors, for the taxable years 1965, 1966 and 1967 with the district director of internal revenue at St. Louis, Missouri. Petitioner's legal residence was St. Louis, Missouri, as of the date his petition was filed with this Court. Petitioners John W. Brandle and Mary Brandle, husband and wife, filed their joint Federal income tax returns for the *26 taxable years 1965 and 1966 with the district director of internal revenue at St. Louis, Missouri. The legal residence of petitioners was St. Louis, Missouri as of the date their petition was filed with this Court. George B. Koors, Jr., and John W. Brandle will hereinafter be referred to as petitioners. Petitioners were the sole stockholders of Stanford Laboratories, Inc. (hereinafter referred to as Stanford), a Missouri corporation incorporated on December 30, 1955, for the purpose of producing and selling a specialized line of medication. On September 25, 1958, C. Dean Cole (hereinafter referred to as Cole) was hired as the west coast sales agent of Stanford on an exclusive basis for the sale of the drugs produced by Stanford. In July of 1960, Cole terminated his employment with Stanford. He then purchased all of the common stock of Mills Pharmaceuticals, Inc. (hereinafter referred to as Mills), a competitor of Stanford, from a Dr. Tedrick, Dr. Tedrick's wife and the corporate bookkeeper. Cole then became president of Mills. 1325 On July 19, 1960, an agreement was executed by and between Stanford and Mills whereby Stanford withdrew from competition with Mills, and Mills *27 obtained the exclusive right to purchase for sale, distribution and promotion the products manufactured by Stanford at the following prices: First $140,000 of sales per annum, at 80 percent of selling price. Next $140,000 of sales per annum, at 55 percent of selling price. All in excess of $280,000 of sales per annum, at 50 percent of selling price. This contract will hereinafter be referred to as the "80 percent contract." The 80 percent contract was performed by both parties. However, Cole indicated to petitioners that he was dissatisfied with it; the price charged by Stanford was too high to permit Mills to compete successfully in the market, thereby creating extreme financial difficulties for it. In a letter to Stanford dated June 22, 1961, Mills confirmed this situation and noted four possible alternatives available to alleviate the predicament. They were: 1. To purchase Stanford at a fair price. 2. To rewrite existing contract between Mills and Stanford on a more equitable basis. 3. To sell Mills. 4. To prove that Dr. Tedrick had breached his contract with Cole, thus canceling the agreement and returning Mills to Tedrick or to forfeit. In response to the letter *28 petitioners worked out an agreement whereby Mills was to secure control of Stanford. In accordance with the above-mentioned arrangement, the board of directors of petitioner authorized Cole to enter into and conclude negotiations for the purchase of the stock of Stanford. Cole was authorized to pay $100,000 for the stock of Stanford, $50,000 for existing inventory, and approximately $15,000 for differentiating inventory as of May 1, 1961. On August 30, 1961, Mills entered into a contract (hereinafter referred to as "contract of purchase") with petitioners where-by Mills agreed to purchase and petitioners agreed to sell all the shares of common stock for a total consideration of $185,280, which was the price asked by petitioners. Mills issued two promissory notes, both having a face amount of $92,910, naming petitioners as payees. The contract did not contain a covenant not to compete. Stanford's balance sheet was included within the contract. The balance sheet reflected a value attributable to the total assets of $52,033.97 which did not include any amount allocated to the 80 percent contract or Stanford's goodwill. In arriving at the sale price petitioners determined the value *29 of Stanford's assets including the 80 percent contract. In calculating the value of the contract they started with a figure of $112,000 representing 80 percent of the first $140,000 of sales. From this figure they subtrcted $63,000 which represented 45 percent of the first $140,000 of sales. The difference, $49,000, was doubled due to the contract's estimated two-year life and rounded to $100,000. They added an additional $85,820 representing the remaining assets held by Stanford in arriving at the above-noted sale price. These computations were made and discussed only by petitioners for the purpose of arriving at a gross sales price of the Stanford stock; they were never mentioned or discussed with Mills. During the taxable years 1965, 1966, and 1967, petitioners each received payments from Mills under the contract of purchase in the total amounts of $9,030.40, $12,720.84, and $8,749.13, respectively. The petitioners reported the total payments which they received on their Federal income tax returns as follows: Long-
Term
Total
Return of
Capital
Year
Payment
Capital
Gain
Koors
1965
$ 9,030.40
$ 81.28
$ 8,949.12
1966
12,720.84
114.49
12,606.35
1967
8,749.13
78.74
8,670.39
Brandle
1965
9,030.40
81.27
8,949.13
1966
12,720.84
114.49
12,606.35
*30 Immediately following the sale of the Stanford stock to petitioner, an agreement designated "favored price and exclusive management agreement" (hereinafter referred to as "favored price agreement"), was executed by and between Stanford, petitioners and Norwood Laboratories, Inc. (hereinafter referred to as Norwood). Norwood, which was owned by Koors and Brandle, had been operating as a sales corporation selling privately-labeled pharmaceuticals throughout the country. The favored price agreement provided in part that Norwood and its stockholders, the petitioners, would sell to Stanford all the drugs specified within the agreement on an exclusive basis at the rate of 45 percent of the list price of said drugs. It further contained a 1326 covenant not to compete whereby Norwood agreed not to compete with Stanford in the sale or distribution of the drugs. [2]
The contract of purchase and the favored price agreement were both executed as part of the same transaction. The contract *31 of purchase did not allocate any portion of the $185,820 sales price to any of the provisions contained in the favored price agreement nor did the favored price agreement note any designation of monetary consideration for the agreements contained therein. An "addendum memorandum agreement" was subsequently executed. It provided that it amended, modified, and extended the 80 percent contract currently in effect and specifically provided for the sale of products from Stanford to petitioner at 45 percent of list price. The transactions consummated by and between Mills and petitioners on August 30, 1961, were recorded on the books of Mills as follows: Investment, Stanford Laboratories, Inc.
$100,304.95
Restrictions covenant
65,037.00
Inventory
16,378.62
Accounts payable - Stanford
4,099.43
Notes payable - G.B. Koors
$92,910.00
J. W. Brandle
92,910.00 Cole, as president of Mills, could not recall any details with respect to the allocation on petitioner's books and records of $65,037 to a covenant not to compete. After these transactions Norwood experienced difficulty with Mills in collecting accounts receivable and payments on the notes issued to *32 petitioners were not kept current. As a result, Miller Laboratories, Inc. (hereinafter referred to as Miller), a corporation owned by petitioners, acquired control of Mills in December of 1962 by paying Dr. Tedrick, then controlling shareholder of Mills, $30,000 for his stock. At the time the stock was transferred to Miller the books and records of petitioner were in general confusion as to what the alleged intangible asset at issue herein actually represented. For the taxable years ended October 31, 1964 and October 31, 1965, Mills claimed deductions for the amortization of the covenant not to compete in the amounts of $5,419.75 and $6,503.70, respectively. For the year ended October 31, 1966, however, Mills changed the designation of the alleged intangible asset, with respect to which it was claiming amortization deductions, from a covenant not to compete to a favored price contract. An amortization deduction of $6,503.70 was claimed in 1966. Opinion The issue for determination relates to whether the consideration received by petitioners from the sale of their stock in Stanford is taxable as long term capital gain or, in the alternative, whether a portion is allocable to a *33 covenant not to compete or an alleged premium paid for an intangible asset thereby subjecting a portion of the consideration to ordinary income treatment. Relying on Mills Pharmaceuticals, Inc., 57 T.C. - (1971), decided this day, we conclude that neither a covenant not to compete nor a premium were intended in the instant transaction, and therefore the transfer of the Stanford stock by petitioners to Mills was merely the sale of a capital asset, requiring capital gain treatment. Decisions will be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. Petitioner was unfamiliar with the production end of the drug business. Therefore, Stanford transferred manufacturing equipment to Norwood which agreed to supply Stanford with the needed drugs.↩